2026 IL App (1st) 250882
No. 1-25-0882
Opinion filed July 2, 2026

SIXTH DIVISION

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| JOHN A. GREENFIELD, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EARL L. BRANNAN and MENARD, INC., d/b/a | ) | No. 23 L 4536 |
| Menards, a Wisconsin Corporation. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | The Honorable |
| (Menard, Inc., Defendant-Appellee). | ) | Maire Aileen Dempsey, |
| | ) | Judge, Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Presiding Justice C.A. Walker and Justice Gamrath concurred in the judgment and
opinion.

OPINION

¶ 1     Plaintiff-appellant John A. Greenfield appeals from the April 16, 2025, circuit court order

granting summary judgment to defendant-appellee Menard, Inc., doing business a Menards, a

Wisconsin corporation (Menards). For the following reasons, we affirm.

¶ 2                                I. BACKGROUND

¶ 3        This is a personal injury action arising from an incident in which plaintiff Greenfield was injured by a section of culvert pipe that fell from defendant Earl Brannan's pickup truck. Shortly before the incident, Brannan (who is not a party to this appeal) purchased the pipe from a store operated by defendant Menards. It is undisputed that a Menards employee helped Brannan put the pipe on his truck in Menards' lumberyard but that Brannan alone attempted to secure the pipe onto his vehicle.

¶ 4        In May 2023, Greenfield filed his original complaint, naming only Brannan as a defendant. Plaintiff alleged that he was riding a bicycle in Marion, Illinois on April 21, 2023, when he was injured by a section of culvert pipe that was "partially detached causing a large portion of it to hang several feet off of the right side" of Brannan's truck. Plaintiff alleged that Brannan was negligent because, *inter alia*, he operated his vehicle while the culvert pipe was not securely fastened and failed to avoid a collision.

¶ 5        On July 31, 2023, plaintiff filed an amended complaint that added Menards as a defendant. Plaintiff alleged that Brannan purchased the culvert pipe from a Menards store in Marion earlier on the date of the accident and that the pipe was "loaded onto the ladder rack" of Brannan's truck "by an agent, servant and/or employee" of Menards who knew or should have known that it would be transported over public roads or highways.

¶ 6        Plaintiff alleged that the Menards agent "owed a duty to exercise due care and caution in the manner and method by which it loaded and secured the culvert pipe onto [Brannan's] motor vehicle, having voluntarily undertaken to load the pipe thereon." The amended complaint alleged that Menards was guilty of negligence by failing to secure the pipe to Brannan's vehicle "so as to prevent it from becoming loose and detached during transport."

¶ 7     The amended complaint pleaded that Menards' duty of care arose from the "voluntary undertaking" to load the pipe, as well as from three statutes: "625 ILCS 5/15-105 (Projecting loads on passenger vehicles), 625 ILCS 5/15-106 (Protruding members of vehicles) and 625 ILCS 5/15-109 (Spilling loads on highways prohibited)."

¶ 8     In written discovery responses, Menards disclosed that a gate guard named William Miller and a former employee, James Holan, worked in the lumberyard at the time of Brannan's purchase. In response to an interrogatory about its policies for loading items onto customer vehicles, Menards answered that "[t]he Picking tickets utilized by Menard, Inc. state that Menards is not allowed to help secure or tie down loads." In a supplemental response, Menards also stated that it had a "self-service loading yard and that it is Menards company policy to not assist customers with securing any loads."

¶ 9     At his deposition, Brannan testified that he drove to the Menards store in his Ford F-150 pickup truck, which had a 10-foot-long metal ladder rack. Inside the store, he purchased a 20-foot-long section of polyethylene pipe. He was given a paper receipt and directed to bring it to a separate secured area outside the store (sometimes referred to as the "lumberyard") to pick up the pipe. He brought his truck to that area, where he showed his receipt to a person who then opened the gate to the lumberyard. Brannan then brought his truck next to a large stack of pipes, where he took the one he had purchased and began to try to get it on his truck.

¶ 10    Brannan started putting the 20-foot section of pipe on his truck. He recalled that he was about one-third done when a "gentleman happened to pass by and helped me shove it up there." Brannan assumed the man was a Menards "helper." Although Brannan did not recall the person's name, the parties do not dispute that it was Holan who assisted Brannan.

¶ 11        Asked to describe how Holan helped him get the pipe onto his truck, Brannan testified: "Well I was holding it like a log on my shoulder, pushing it up there. And he came along, went off to the side of the pipe and grabbed ahold of it—start[ed] reaching up just to get ahold of it and helped me finish putting it up there." Brannan identified security video footage showing the man helping him in the lumberyard.

¶ 12        Brannan specifically denied that he and the Menards agent ever discussed tying the pipe down or otherwise securing it. Brannan did not ask for help and testified that he "didn't expect" the man to help him secure the pipe because "it's my truck." Brannan planned to secure the pipe with his own "two-inch wide ratchet strap." Brannan testified that he had previously secured items on his truck in the same manner, including items purchased from Menards.

¶ 13        Elsewhere, Brannan testified that he had previously purchased 20-foot sections of 10-inch diameter pipe from Menards, and on those occasions he had been able to load them onto his truck by himself. On the date in question, Brannan was buying a 20-foot section of 12-inch diameter pipe, but he still believed that he could have put the pipe on his truck by himself: "I could have put the 12-inch on, but the gentleman offered to help, so I accepted his offer."

¶ 14        Brannan testified that, after the pipe was on his truck, the security person checked his receipt and opened the gate so he could leave the lumberyard. At that point, the pipe was not yet tied down on his truck. Outside the lumberyard but before he left Menards' property, Brannan pulled over "and secured the pipe" himself, using his ratchet strap.

¶ 15        Later that day, Brannan was at a stoplight when a Marion police officer pointed to the top of his truck. Brannan looked up and saw that the pipe had "migrated over to the right-hand side of the ladder rack." In his side mirror, he could see the pipe "hanging over the side" of the truck.

¶ 16      A short time later, Brannan stopped in the parking lot of a Rural King store to make a purchase. In the parking lot, he used twine to secure the pipe on the ladder rack before entering the store. When Brannan came out of the store, he encountered police officers near his truck. The police asked him if he knew he had hit someone; Brannan told them he had "no idea" that anyone had been injured. Brannan was subsequently questioned at the police station, where he explained he was "completely unaware" anyone had been hurt by the pipe.

¶ 17      The parties deposed John Mehlbrech, general manager of the Menards store in Marion where Brannan purchased the pipe. Asked about Menards' policies for loading and securing purchased items, he testified there is a "self-service lumber yard which means people can come and load their own," but if a customer "requests help, we will help them load merchandise on their vehicle or trailer." He stated that Menards allowed employees to help customers with loading purchases but "[w]e don't do any securing." He agreed that, as of 2023, "Menards employees were not permitted to secure or help secure large or heavy objects to customer's vehicles." This was a long-standing policy of all Menards stores "due to insurance and liability reasons."

¶ 18      The assistant manager of the store, Vic Harding, was deposed and similarly testified that, although Menards employees may help a customer place a load on a vehicle, they are not allowed to secure it. Harding recalled that, as of 2023, there was a sign near the lumberyard advising that "it was a self-service yard and help yourself. If you need help, we will help load your product onto your vehicle."

¶ 19      Harding testified that, when customers purchased items to pick up from the lumberyard, they were issued "picking tickets" listing the items. The small print at the bottom of each picking ticket told customers that Menards could help load purchases but would not secure the load. The record reflects that such tickets stated:

"Our insurance does not allow us to tie down or secure your load, trunk lid, etc. For your convenience, we supply twine, but you will have to decide whether or not your load is secure and if the twine supplied is strong enough. If you do not believe the twine will suffice, stronger material can be purchased inside the store."

¶ 20        Harding explained that, near the lumberyard, there was a "tie-down shed containing ropes, staples and red flags" that customers could use to secure loads. Employees were permitted, but not required, to suggest that customers use the tie-down shed. If customers could not secure any items on their vehicle, they could choose to have them delivered for an extra fee.

¶ 21        Holan was deposed and confirmed that he worked in the lumberyard at the Menards store in April 2023. His duties included operating a forklift to transport lumber and offering to help "customers to load and unload trucks."

¶ 22        Holan did not have any recollection of Brannan, but he agreed he had no reason to deny that he was the one who helped Brannan load the pipe onto his truck. Holan was shown video footage of someone putting pipe on Brannan's pickup truck, but he could not tell if he was the person shown.

¶ 23        Holan was asked about the store's policies for loading large items. Holan recalled that he would offer to help customers load items onto vehicles, but he was not required to help them do so. He answered negatively when asked if employees were "instructed or required to ensure items are properly secured after loading them onto customer vehicles." He recalled the general manager telling him that Menards' insurance did not allow employees to help tie down or secure loads.

¶ 24        On February 19, 2025, Menards filed a motion for summary judgment. It argued that, insofar as its liability was premised on a theory of voluntary undertaking, the alleged assistance by

its employee in lifting the pipe onto Brannan's vehicle did not create a duty to properly secure the load. Menards emphasized that, under a theory of voluntary undertaking, any duty is limited to the extent of the undertaking. According to Menards, the undertaking in this case was limited to lifting and loading (but not securing) the pipe. Accordingly, Menards urged that the mere act of loading the pipe did not create a duty to secure it.

¶ 25    Menards cited section 324A of the Restatement (Second) of Torts, which provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking." Restatement (Second) of Torts § 324A (1965).

¶ 26    Menards emphasized there was no dispute that Menards did not help secure the pipe; the only action by Menards' employee was helping to lift the pipe onto Brannan's truck. Menards also noted that plaintiff did not plead that the pipe "was lifted or loaded negligently." Menards urged that the only "negligent act happened significantly later when Mr. Brannan failed to tie down the pipe properly" outside the lumberyard. As Menards "did not undertake any action to secure the pipe" to Brannan's truck, there could be no liability under section 324A(b) because Brannan was "solely responsible" for securing the pipe. Menards also argued liability could not be imposed under a voluntary undertaking theory, because the evidence established that Brannan "did not rely

on Menards to secure the pipe." Menards noted Brannan's testimony that he did not expect anyone from Menards to secure the pipe onto his truck.

¶ 27     In plaintiff's response to Menards' motion for summary judgment, he argued that, because both Brannan and Holan acted "in concert" to lift and load the pipe into the truck, both had a duty to secure it. Because both helped load the pipe, plaintiff urged that both owed a duty of care to the traveling public to take reasonable steps "to protect those who could foreseeably be harmed should it become dislodged."

¶ 28     Plaintiff also argued that Menards owed a duty because its agent "voluntarily assisted Mr. Brannan in the creation of the foreseeably dangerous condition." Even if Holan did not initially have a duty to assist loading the pipe, plaintiff argued that, once he did, he owed a duty to secure it or ensure that someone did. Plaintiff also contended that Menards' policy prohibiting employees from securing items to customer vehicles was irrelevant, because its employee "helped create the dangerous condition" of an unsecured pipe on top of a motor vehicle. Plaintiff maintained that this duty existed, even if Holan did not try to secure the pipe.

¶ 29     Menards filed a reply brief in which it suggested that plaintiff could not rely on a "concert of action" theory in opposition to its summary judgment motion, as plaintiff never pleaded such theory. Menards pointed out that plaintiff's amended complaint did not assert a "concert of action" theory but instead pleaded a "voluntary undertaking" theory. Menards argued these are distinct theories of negligence liability based on separate sections of the Restatement (Second) of Torts.

¶ 30     Menards further argued that, even if a "concert of action" theory could be considered, Menards could not be liable because there was no independent negligence by Menards' employee. It urged the only action taken by its employee was helping to lift the pipe but there was "no allegation, much less any evidence that this action was done negligently."

¶ 31 With respect to the concept of voluntary undertaking, Menards emphasized a distinction between "loading" and "securing" an object. It urged that, because a duty under a voluntary undertaking theory is "limited the extent of the undertaking," here the duty was limited to the act of its employee in lifting the pipe. It urged that any duty did not extend to a "completely separate action done by someone else not in the employee's presence."

¶ 32 There is no transcript in the appellate record of the hearing on Menards' motion for summary judgment. On April 16, 2025, the trial court issued a written order granting the motion and entering judgment in favor of Menards, such that the case remained pending against Brannan only. The court specified that, pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), there was no just reason to delay an appeal from the order.

¶ 33                                    II. ANALYSIS

¶ 34 On appeal, plaintiff challenges the entry of summary judgment in Menards' favor, contending that Menards (through its agent Holan) owed a duty to secure the pipe onto Brannan's vehicle, once Holan helped Brannan load the pipe onto the truck. Plaintiff argues that, "together," Holan and Brannan "simultaneously" created a foreseeably dangerous condition, such that each had a duty to take reasonable precautions to protect others from it.

¶ 35 Plaintiff relies on both the concept of voluntary undertaking under sections 323 (Restatement (Second) of Torts § 323 (1965)) and 324A of the Restatement (Second) of Torts, as well as the concept of "in concert" liability set forth in section 876 of the same Restatement. Restatement (Second) of Torts § 876 (1979). For the following reasons, we conclude that, given the undisputed facts, plaintiff cannot establish Menards' liability under either negligence theory. Thus, summary judgment in Menards' favor was proper.

¶ 36                                  Standard of Review

¶ 37 Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Illinois Founders Insurance Co. v. Williams*, 2015 IL App (1st) 122481, ¶ 30; 735 ILCS 5/2-1005 (West 2024).

¶ 38 *De novo* review applies to the entry of summary judgment. *Illinois Founders Insurance Co.*, 2015 IL App (1st) 122481, ¶ 30. Under *de novo* review, "We may affirm on any basis appearing in the record, whether or not the trial court relies on that basis or its reasoning was correct." *Omega Demolition Corp. v. Illinois State Toll Highway Authority*, 2022 IL App (1st) 210158, ¶ 36.

¶ 39 "In order to prevail in an action for negligence, the plaintiff must prove that the defendant owed a duty, that the defendant breached that duty, and that defendant's breach was the proximate cause of injury to the plaintiff. [Citation.] Unless a duty is owed, there can be no recovery in tort for negligence. [Citations.]" *Bell v. Hutsell*, 2011 IL 110724, ¶ 11. Whether a duty exists is a question of law subject to *de novo* review. *Id.*

¶ 40 Summary judgment in favor of a defendant is proper where the plaintiff fails to establish the existence of a duty. *Sanchez v. Wilmette Real Estate & Management Co.*, 404 Ill. App. 3d 54, 59 (2010). " 'Whether under the facts of a case there is a relationship between the parties as to require that a legal obligation be imposed upon one for the benefit of another is a question of law to be determined by the court.' " *Id.* (quoting *Rowe v. State Bank of Lombard*, 125 Ill. 2d 203, 215 (1988)).

¶ 41      Here, plaintiff urges that Menards should be subject to negligence liability under two theories: (1) voluntary undertaking and (2) "in concert" liability based on its assistance to Brannan in loading the pipe. We address these in turn.

¶ 42                                    1. Voluntary Undertaking

¶ 43      Insofar as plaintiff relies on a theory of voluntary undertaking, under the undisputed facts, we think it is clear that Menards' undertaking extended only to help get the pipe onto Brannan's truck. This is a separate and distinct act from attempting to tie down or otherwise secure the load. In turn, we reject plaintiff's suggestion that Menards' voluntary undertaking gave rise to a duty to secure the load on Brannan's vehicle.

¶ 44      Our supreme court has looked to Restatement (Second) of Torts sections 323 and 324A in defining the parameters of liability under the voluntary undertaking theory. *Bell*, 2011 IL 110724. Under section 323:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> > (a) his failure to exercise such care increases the risk of such harm, or
> >
> > (b) the harm is suffered because of the other's reliance upon the undertaking." Restatement (Second) of Torts § 323 (1965).

Section 324A concerns liability to third persons for negligent performance of an undertaking:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or

his things, is subject to liability to the third person for physical harm resulting from his

failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third

person, or

(c) the harm is suffered because of reliance of the other or the third person

upon the undertaking." Restatement (Second) of Torts § 324A (1965).

¶ 45        "Under a voluntary undertaking theory of liability, the duty of care to be imposed upon a defendant is limited to the extent of the undertaking." *Bell*, 2011 IL 110724, ¶ 12 (citing *Frye v. Medicare-Glaser Corp.*, 153 Ill. 2d 26, 32 (1992), and *Pippin v. Chicago Housing Authority*, 78 Ill. 2d 204, 210 (1979)). "The theory is narrowly construed." *Id.*; see *Iseberg v. Gross*, 366 Ill. App. 3d 857, 865 (2006) ("The essential element of the voluntary undertaking doctrine is an undertaking, and the duty of care imposed on a defendant is limited to the extent of his undertaking.").

¶ 46        "Like other issues of duty, whether a defendant has voluntarily undertaken a duty to a plaintiff is a question of law for the court ***." (Internal quotation marks omitted.) *Bourgonje v. Machev*, 362 Ill. App. 3d 984, 995 (2005). Without a showing from which the court may infer the existence of a duty, no recovery by plaintiff is possible, and summary judgment in favor of the defendant is proper. *Id.* (citing *Haupt v. Sharkey*, 358 Ill. App. 3d 212, 216 (2005)). However, "if there is a dispute of material fact affecting the existence of an undertaking of a duty, summary judgment is improper." *Id.*

¶ 47        Decisions illustrate that courts narrowly construe the extent of the alleged undertaking. For example, our supreme court rejected a claim that, when a pharmacist added a drowsiness warning

label to a medication, it represented an undertaking to warn users of "all potential dangers involved in taking" the drug. *Frye*, 153 Ill. 2d at 33 ("The extent of the defendants' undertaking was the placing of the 'drowsy eye' label on Frye's prescription container which warned that Fiorinal may cause drowsiness.").

¶ 48    *Bell* also illustrates this principle. There, plaintiffs were parents of an 18-year-old who died in a car accident after consuming alcohol at a party hosted at defendants' home hosted by defendants' son. *Bell*, 2011 IL 110724, ¶ 3. The plaintiff alleged that defendants voluntarily undertook a duty to prohibit underage drinking at the residence, because they had told their son that "they would monitor the party to see that underage partygoers did not possess or imbibe alcoholic beverages." *Id.* Plaintiffs claimed defendants knew there was underage drinking and that one of the defendants told partygoers that they should not drive home if they had been drinking. *Id.* ¶¶ 4-5.

¶ 49    Rejecting plaintiff's voluntary undertaking theory, our supreme court reasoned that, even if defendants "expressed an intention to prohibit" underage drinking at the party, this was insufficient to conclude that they had undertaken a duty to prevent underage drinking. *Id.* ¶ 26. The court explained:

> "Plaintiff alleges that defendants were aware of underage drinking, and took no action. Given these facts, for there to be a substantial step in pursuit of the alleged undertaking, there must have been some affirmative action taken in an attempt to *prohibit* possession and consumption of alcohol, the ultimate objective of the undertaking. No affirmative action is alleged here." (Emphasis in original.) *Id.*

¶ 50    The *Bell* court further noted that, "even if we were to find sufficient allegations of a duty voluntarily assumed," the alleged facts did not provide a basis for liability because they "do not support an inference that defendants' stated intent and subsequent inaction increased the risk of harm *** nor does it evince reliance or change of position on the basis of defendants' expressed intent." *Id.* ¶ 27.

¶ 51    A number of cases involving claims against landowners demonstrate the same principle that any voluntary undertaking is narrowly construed. In *Rowe*, 125 Ill. 2d at 218-19, our supreme court rejected a claim that a landlord's maintenance of locks and outdoor lighting was an assumption of duty to protect tenants from third-party criminal acts. The *Rowe* court noted that "even if [the landlord] had undertaken to perform such services, its duty was limited by the extent of the undertaking, *viz*, to use reasonable care in providing the necessary lighting and assuring that the locks were in working order." *Id.* at 218-19 (noting there was no evidence that the locks were not functioning or that the lighting was inadequate); see *Sedlacek v. Belmonte Properties, LLC*, 2014 IL App (2d) 130969, ¶ 31 (where tenants' Rottweiler injured a third party, the landlord's alleged promise to fix a fence around the tenants' backyard did not amount to the undertaking of a duty to protect third parties from the dog); *Sanchez*, 404 Ill. App. 3d at 63 (management company's promise to maintain door locks and to keep vacant apartments locked "did not rise to a voluntary undertaking to protect the plaintiff from the criminal acts of third parties").

¶ 52    No Showing That Menards Voluntary Undertook to Secure (Not Just Load) the Pipe

¶ 53    Given the undisputed facts, we agree with Menards that there is no evidence that Menards (through Holan) engaged in a voluntary undertaking giving rise to a duty to *secure* the pipe. Rather, the undertaking was merely to help to load the pipe onto the customer's vehicle.

¶ 54        We keep in mind that the extent of an undertaking is narrowly construed. Here, there is no evidence that, after the pipe was on Brannan's vehicle, Menards' undertaking extended to tying down or otherwise securing it. It is undisputed that Holan never offered to help Brannan do so, and Menards' policy precluded him from doing so. Nor is there any evidence that Brannan asked for help. Rather, Brannan testified that, consistent with his prior practice, he tied the pipe down himself after leaving the lumberyard. Although Menards' agents offered to help place heavy loads on vehicles as a matter of customer service, we decline to read into that policy a broader undertaking to safely secure such loads.

¶ 55        The parties do not identify Illinois cases with similar facts. But given the directive to apply a narrow construction to the undertaking, we think this is roughly analogous to the conclusion that a pharmacist's decision to put a drowsiness warning does not give rise to a duty to warn of all dangers (*Frye*, 153 Ill. 2d at 33) or that a landlord's decision to provide exterior lighting does not create duty to protect from criminal acts.

¶ 56        At this point, we briefly note plaintiff's contention that evidence of Menards' internal policies is irrelevant to the question of duty. Certainly, we do not mean to suggest that a company policy can eliminate a common-law duty. However, where a plaintiff relies on a voluntary undertaking theory, we see no reason why a defendant's stated policies cannot be considered in deciding the extent of the voluntary undertaking. In any event, even were we to ignore the evidence of Menards' stated policies in this case, the deposition evidence shows that Menards' agent simply never undertook to do anything for Brannan except helping to lift the pipe onto Brannan's car.

¶ 57        In short, we believe the undisputed facts show that Menards did not actually undertake to secure the load that Brannan purchased. This precludes plaintiff's reliance on a voluntary undertaking theory.

¶ 58            Brannan Did Not Rely on Any Purported Undertaking to Secure the Load

¶ 59            We also note that, even assuming *arguendo* we agreed that Menards had undertaken a duty to secure the pipe, the evidence is undisputed that Brannan did not rely on it. Rather, Brannan testified that he did not expect anyone to help him and that he sought to secure the pipe himself. Insofar as plaintiff alleges that Menards failed to perform a voluntary undertaking to secure the load, this lack of reliance is fatal.

¶ 60            On this point, our supreme court in *Bell* recognized a distinction between voluntary undertaking claims based on nonfeasance ("omission to perform a voluntary undertaking") and misfeasance ("negligent performance of a voluntary undertaking"). *Bell*, 2011 IL 110724, ¶ 23.

¶ 61            *Bell* recognized that reliance is required where the theory of voluntary undertaking is nonfeasance:

> "Decisions of our appellate court have also underscored the necessity of reliance if a defendant is to be held responsible for nonfeasance: ' "Under Illinois law, a plaintiff's reliance on the defendant's promise is an independent, essential element in cases of nonfeasance." ' *Buerkett v. Illinois Power Co.*, 384 Ill. App. 3d 418, 428 (2008) (quoting *Bourgonje v. Machev*, 362 Ill. App. 3d 984, 997 (2005))." *Id.*

In other words, "In cases of nonfeasance, reliance forms one component of proximate cause." *Bourgonje*, 362 Ill. App. at 997.

¶ 62            In this case, plaintiff's voluntary undertaking claim is one of nonfeasance, *i.e.*, that Menards undertook to secure the pipe onto Brannan's truck but failed to do so. Yet there is no evidence that either Brannan or plaintiff relied on Menards to do so. To the contrary, Brannan

testified unequivocally that he never expected Menards to secure the pipe, even after Holan helped him get it on his truck. Rather, Brannan testified that, after Holan helped him in the lumberyard, he drove to another area where he independently undertook to tie down the pipe with his own materials.

¶ 63        Under the record before us, plaintiff cannot show the element of reliance for a voluntary undertaking claim based on nonfeasance. This independently warrants summary judgment, insofar as plaintiff's claim was premised on a voluntary undertaking theory.

¶ 64                              2. "In Concert" Liability

¶ 65        We turn to address plaintiff's reliance on a theory of "in concert" liability, pursuant to section 876 of the Restatement (Second) of Torts. Specifically, plaintiff asserts that this case falls within the scope of section 876(c), alleging that Menards' agent provided "substantial assistance" to Brannan's tortious conduct by helping load the pipe onto Brannan's vehicle. See Restatement (Second) of Torts 876(c), at 315 (1979).

¶ 66        Menards primarily urges that we should not consider this theory of liability because it was not pleaded in the amended complaint. On the merits, Menards responds that plaintiff cannot establish the requisite "substantial assistance" and that plaintiff cannot show that Menards' conduct "separately considered, constitutes a breach of duty" within the meaning of section 876(c). *Id.*

¶ 67                                    Forfeiture

¶ 68        We briefly address Menards' contention that we should not consider plaintiff's arguments on a "concert of action" theory because it was not specifically pleaded in the operative complaint. Menards notes that this theory is distinct from a "voluntary undertaking" theory and that these concepts are based on separate provisions of the Restatement (Second) of Torts.

¶ 69    On this point, plaintiff's reply brief cites the principle that pleadings are liberally construed. There is no dispute that plaintiff's amended complaint did not use the terms "concert of action" or "in concert" liability, nor did it cite section 876 of the Restatement. Yet plaintiff maintains his pleading was sufficient to encompass reliance on this theory, insofar as it alleged that Menards "owed a duty *** in the manner and method by which it loaded and secured the culvert pipe *** having voluntarily undertaken to load the pipe."

¶ 70    Generally, a party cannot assert new facts or theories in response to motion for summary judgment. This court has stated: "[I]t is axiomatic that summary judgment motions are limited to the issues raised in the complaint, and a plaintiff cannot raise new issues not previously pled in its complaint in order to obtain, or defeat a motion for, summary judgment." *800 South Wells Commercial LLC v. Cadden*, 2018 IL App (1st) 162882, ¶ 43. "Some courts, however, have permitted a plaintiff to raise a matter for the first time in connection with summary judgment proceedings where the new matter represents a new basis for a previously pled theory of recovery. [Citations.]" *Potek v. City of Chicago*, 2026 IL App (1st) 250158, ¶ 58; see *Feliciano v. Geneva Terrace Estates Homeowners Ass'n*, 2014 IL App (1st) 130269, ¶ 34 (where complaint alleged breach of fiduciary duty, additional basis for alleging breach of fiduciary duty was proper).

¶ 71    We think the instant situation falls into the latter category. The allegations of the amended complaint clearly alleged that Menards was negligent based on its employee's act of helping Brannan load the pipe, which was not properly secured. Menards was certainly on notice of the fundamental factual basis for the negligence claim. We think this is sufficient to permit plaintiff to rely on an "in concert" theory, even if the operative complaint did not use that specific phrase or cite the pertinent section of the Restatement. We thus decline to find that plaintiff forfeited reliance on this theory of liability.

¶ 72       In any event, even assuming that plaintiff forfeited the theory, it is well settled that "[f]orfeiture is a limitation on the parties and not on the reviewing court." *Monroy-Perez v. Sentry Select Insurance Co.*, 2025 IL App (1st) 241711, ¶ 31; see *Jakubowski v. Alden-Bennett Construction Co.*, 327 Ill. App. 3d 627, 638 (2002) (choosing to address plaintiff's voluntary undertaking theory on appeal from summary judgment, notwithstanding that this specific theory was not pleaded). We elect to reach the merits of this theory, regardless of any forfeiture. Thus, we proceed to analyze plaintiff's contentions that summary judgment was improper, because there is a triable issue of Menards' liability under a concert of action theory.

¶ 73       The parties agree that section 876 of the Restatement (Second) of Torts governs. That section provides:

> "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
>> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>>
>> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>>
>> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." Restatement (Second) of Torts § 876 (1979).

¶ 74       Both subsections (b) and (c) require that the defendant gave "substantial assistance" to the other. In this case, plaintiff specifically relies on subsection (c), which requires both "substantial assistance" and that the defendant's own conduct, "separately considered," constitutes a breach of

duty to the third person. The parties dispute whether plaintiff can satisfy either of these elements. We consider these in turn.

¶ 75                    Whether Menards Provided Substantial Assistance to Brannan

¶ 76        To sustain a claim against Menards under section 876(c), plaintiff must show that Menards provided "substantial assistance" to Brannan's allegedly tortious conduct. In other words, we must consider whether Holan's act in helping Brannan get the pipe onto the truck constituted "substantial assistance" to Brannan's alleged negligence in failing to secure the pipe. For the reasons below, we conclude that it did not.

¶ 77        Comment d to section 876 illustrates the concept of substantial assistance:

> "Advice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance. If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act." Restatement (Second) of Torts § 876 cmt. d, at 317 (1979).

¶ 78        However, the same comment advises that "[t]he assistance of or participation by the defendant may be so slight that he is not liable for the act of the other." *Id.* "In determining this, [1] the nature of the act encouraged, [2] the amount of assistance given by the defendant, [3] his presence or absence at the time of the tort, [4] his relation to the other and [5] his state of mind are all considered." *Id.* These five factors should be "considered in determining whether in-concert liability will attach." *Simmons v. Homatas*, 236 Ill. 2d 459, 477 (2010).

¶ 79       Generally, "[t]he question of whether a defendant has substantially assisted or encouraged another person in his tortious conduct based on the above factors is a question for the jury." *Id.* at 477-78. At the same time, we recognize that, if the record shows that plaintiff cannot establish any element of his claim, summary judgment is appropriate. *Dardeen v. Kuehling*, 213 Ill. 2d 329, 335 (2004).

¶ 80       Here, plaintiff asserts that Menards' agent, Holan, gave active assistance to creating a dangerous condition when Holan helped load the pipe on Brannan's truck. Plaintiff largely relies on *Fortae v. Holland*, 334 Ill. App. 3d 705, 717 (2002), which found "substantial assistance" to support imposition of in concert liability under section 876(b).

¶ 81       *Forte* concerned a crash involving two vehicles that were working together to transport a manufactured home. *Id.* at 708. Akers drove a semi-tractor carrying the heavy load. Defendant Holland drove the lead vehicle; he testified that he was responsible for warning Akers by radio about dangerous road conditions and maintaining distance between the two vehicles. *Id.* at 708-09. Just before the collision, Holland's lead vehicle applied brakes without warning Akers. Akers's vehicle collided into the rear of Holland's vehicle, which was forced into oncoming traffic and struck plaintiff's vehicle. *Id.*

¶ 82       The jury was instructed on in-concert liability using language from section 876 of the Restatement, including that a person acts in concert with another person if a defendant "knows that the other person's conduct is negligent and gives substantial assistance to the other" or "gives substantial assistance to the other in accomplishing a negligent result and his own conduct, separately considered, constitutes a breach of duty to the plaintiff." (Internal quotation marks omitted.) *Id.* at 715.

¶ 83        On appeal from a plaintiff's verdict, the Fifth District of this court rejected the defendants' challenge to the jury instruction, finding that section 876 accurately stated the law. *Id.* at 715-716. Further, the court found evidence from which the jury could find that Holland gave "substantial assistance" to Akers:

> "Holland's relation to the other (Akers) as an escort vehicle weighs in favor of the assistance being substantial. Akers' testimony that he had previously warned Holland on the radio that he could not make abrupt stops also indicates a state of mind on the part of Holland which supports a finding of substantial assistance. In addition, Holland's presence was necessary for the commission of the tort, and indeed, he was physically involved in the traffic accident." *Id.* at 720.

¶ 84        *Fortae* distinguished its facts from *Umble v. Sandy McKie & Sons, Inc.*, 294 Ill. App. 3d 449 (1998). In *Umble*, the Second District of this court affirmed dismissal of a complaint against a vehicle service station that repaired a car brought in by an intoxicated driver (Butzen) and returned it to him shortly before he was involved in a fatal collision. *Id.* at 450-51. The *Umble* plaintiff claimed that, by fixing Butzen's car, the defendant service station gave "substantial assistance or encouragement" to Butzen within the meaning of section 876. (Internal quotation marks omitted.) *Id.* at 451. The *Umble* court disagreed, reasoning:

> "The complaint contains no allegation that any of defendant's employees actively encouraged Butzen to get back in his car and drive. We do not equate failing to prevent certain conduct with actively encouraging that conduct. Moreover, the complaint's

allegations do not establish that defendant provided substantial assistance to Butzen. There is no allegation that Butzen's car was inoperable before defendant made the repairs." *Id.* at 451-52.

¶ 85        *Fortae* reasoned: "Unlike *Umble*, the nature of the relationship between Holland and Akers meant that failing to act to prevent Akers from driving too closely was encouragement for such conduct." *Fortae*, 334 Ill. App. 3d at 719 ("In contrast to a garage mechanic's ability to observe a driver's possible drunkenness, Holland's relationship with Akers placed on him the responsibility to observe Akers' driving.").

¶ 86        After reviewing the record and case law, we conclude plaintiff cannot establish evidence of "substantial assistance" to support in concert liability. That is, plaintiff cannot show that Menards' agent actively assisted in facilitating Brannan's allegedly tortious conduct.

¶ 87        Insofar as plaintiff relies on *Fortae*, that case is easily distinguishable, given the evidence about the relationship between the two drivers in that case. The drivers in *Fortae* were working together to transport a mobile home, and the lead driver was responsible for warning the second driver about hazards. *Fortae* specifically cited "Holland's relation to the other (Akers) as an escort vehicle" as weighing "in favor of the assistance being substantial." *Id.* at 720.

¶ 88        The situation in *Fortae* bears no resemblance to the facts here. There was no prior relationship or evidence of a coordinated plan between Menards' agent (Holan) and Brannan. Rather, the evidence shows only a momentary interaction in which Brannan accepted Holan's help in pushing the pipe onto his truck. There was no other communication between the individuals, both of whom testified they did not discuss any effort to tie down the load. Moreover (in contrast to the two drivers in *Fortae*), it is undisputed that Menards' agent Holan was not even present when Brannan attempted to secure the pipe himself.

¶ 89    We reiterate that, for liability under section 876, the "defendant must actively do something to facilitate another's tortious conduct." *Simmons v. Homatas*, 386 Ill. App. 3d 998, 1006 (2008). There is no evidence that Holan actively facilitated Brannan's allegedly negligent failure to tie down the pipe, which occurred after Brannan left the lumberyard. Moreover, Brannan's testimony indicates that, even without Holan's help, he would have still loaded the pipe onto his truck and attempted to secure it in the same manner. See *Umble*, 294 Ill. App. 3d at 452 (noting that, even if the service station defendant "refused to make the repairs" to the intoxicated driver's vehicle, he "could simply have continued driving").

¶ 90    We think the present situation is analogous to *Umble*, insofar as there is no evidence that anyone from Menards actively encouraged Brannan *not* to properly secure the load. See *id.* at 451 (in finding no substantial assistance, noting "no allegation that any of defendant's employees actively encouraged Butzen to get back in his car and drive"). Menards did not prevent Brannan from securing the load in a negligent manner. But as *Umble* stated: "We do not equate failing to prevent certain conduct with actively encouraging that conduct." *Id.* at 451-52.

¶ 91    In short, we do not find any evidence supporting a finding of "substantial assistance" within the meaning of section 876 and our precedent.

¶ 92         Plaintiff Otherwise Cannot Establish Liability Under Section 876(c) Because Menards'
                Conduct, "Separately Considered," Was Not A Breach of Duty

¶ 93    Our finding that there is no "substantial assistance" is dispositive in precluding plaintiff from establishing liability under section 876(c) of the Restatement. Restatement (Second) of Torts § 876(c) (1979). However, we briefly note our agreement with Menards that, separate from whether it gave "substantial assistance," plaintiff otherwise could not meet section 876(c)'s

additional requirement that Menards' "*own conduct, separately considered*, constitutes a breach of duty to [plaintiff]." (Emphasis added.) *Id.*

¶ 94  That is, this subsection requires proof that Menards' conduct, independent of Brannan's, breached some duty to plaintiff. Yet, in this case, the undisputed facts are that Holan's involvement was limited to the act of helping Brannan lift the pipe onto the truck. Menards correctly points out that there is no allegation or evidence that Holan was negligent in performing that specific action, which occurred in the lumberyard before Brannan independently attempted to secure the pipe elsewhere. For this additional reason, we also determine that plaintiff cannot establish Menards' liability pursuant to section 876(c).

¶ 95                                   CONCLUSION

¶ 96  For the foregoing reasons, we affirm the circuit court's entry of summary judgment in favor of Menards.

¶ 97  Affirmed.

---

*Greenfield v. Brannan*, **2026 IL App (1st) 250882**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 23-L-4536; the Hon. Maire Aileen Dempsey, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Brendan H. Kevenides, of Freeman Kevenides Law Firm, LLC, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Brent D. Tinkham, of Taylor Miller LLC, of Chicago, and Christopher A. Koester and Kara J. Wade, of Taylor Law Offices, P.C., of Effingham, for appellee Menard, Inc. |

---